IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 24 CR00037-001 MSM-PAS |
| MICHAEL BRIER, | |
| Defendant | |

# GOVERNMENT'S SENTENCING MEMORANDUM

Michael Brier ("Brier") has lived a life of fraud and deceit to feed his own greed. He has repeatedly demonstrated a contempt for the law, his own clients, and this Court, and he has continued this pattern of fraud and criminality despite a significant prior term of incarceration. All of this makes clear that nothing short of incarceration for a long period of time will stop Brier from committing more crimes. The government recommends Brier be sentenced to ten years of incarceration, three years of supervised release, restitution in the amount of $3,515,100, and forfeiture of $3,515,100.

As this Court (Lisi, J.) emphasized at the close of his last federal prosecution, Brier possesses education, opportunity, and intelligence. He could have legally earned a fine living and lived a productive life. Instead, he has embezzled and cheated his way through life. He began engaging in embezzlement at least from the late 1990's and continued to carry out extensive criminal conduct and civil frauds for the next quarter century. He has been subject to civil court orders directing him to stop, has been charged, found guilty, and sentenced for federal crimes, and nevertheless continued the conduct over and over again. PSR ¶¶ 70-80.

In 2013, he was convicted of filing fraudulent tax returns. Before he was convicted, the Court entered an order permanently enjoining Brier for preparing any federal tax returns based

upon a finding that Brier fraudulently manipulated client tax returns for years, resulting in a government-estimated loss of more than $1.1 million in tax revenue. PSR ¶ 75, *United States v. Brier*, 2010 WL 4510945 (D. RI 2010), *3, 11-12.  Despite that order, Brier continued his fraudulent tax preparation services, and lied to the Court in a sworn affidavit about his compliance with the order. PSR ¶ 75.  The Court found him guilty of criminal contempt, in addition to the tax evasion charge, as a result.  Brier was sentenced to 27 months.  Moreover, in that sentencing, the Court, in imposing sentence, warned Brier against further misconduct, stating:

> [M]ake no mistake about it, Mr. Brier, when you are released from prison, if you engage in this sort of behavior again, there will be no breaks; and frankly, if it means that we incarcerate you to shut you down completely because you will not abide by Court rulings, then that's what we will do.

Attachment (Att.) A, 2013 Sentencing Transcript .at 12-13.

However, far from listening to this Court and reforming, by 2018, while still on supervised release for those crimes, Brier had already launched his next criminal scheme and created a company and obtained a Medicare billing number by fraud.  Using false information to conceal his criminal record and role in the company, Brier then proceeded to cheat public and private health insurers out of millions of dollars intended for the treatment of persons suffering from addiction, and deprived patients seeking addiction treatment of critical services. He betrayed the trust of this vulnerable population seeking to improve their lives by directing his own employees *not* to provide the valid therapy sessions that the therapists sought to provide, that patients were seeking, that the patients needed, that the law required, and for which he was also wildly overbilling.

Under the plea agreement pursuant to Rule 11(c)(1)(C), the parties have agreed upon a plea that requires a term of incarceration between 72 and 120 months. Brier's history makes clear

2

that he will not change his fraudulent ways or contempt for the law or the people whom he purports to serve. In fact, it makes clear that a significant term of incarceration is the only option to prevent this defendant from continuing to commit additional crimes.

## FACTUAL SUMMARY

A. <u>Personal Background</u>

Brier grew up in Providence and had a supportive family and upbringing filled with opportunities for success and a productive, honest life. *See United States v. Brier*, No. C.A. 09-607-ML, 2010 WL 4510945, at *2 (D.R.I. Nov. 5, 2010).

Brier received his undergraduate degree from the University of Rochester and a master's degree in business administration from the University of Rhode Island. Brier began practicing as an accountant in 1987. He received his certification as a certified public accountant ("CPA.") in 1991. *Id.*

B. <u>Professional Suspensions for Unlawful Practices</u>

Brier's CPA certification, however, was suspended in 1999, by a consent order with the State of Rhode Island Board of Accountancy ("Board"), in which Brier accepted the Board's findings that he had engaged in the "unlawful practice of accounting, unlawful use and disclosure of confidential information, and dishonesty, fraud or negligence in the practice of accounting." *Id.*

In June 2003, the IRS notified Brier that he was no longer eligible to practice before the IRS. In 2005, the Rhode Island Department of Business Regulation issued an order barring Brier from associating with a licensed broker/dealer or an investment advisor in the state of Rhode Island. That order was based on Brier's falsification of his

3

application to apply for a license as a broker/dealer. In his application, Brier failed to disclose that his C.P.A. license had been suspended. *Id.*

### C. Prior Findings of Willful and Egregious Misconduct by Brier

Brier also was found to have engaged in willful and malicious misconduct in a civil case for conduct from the late 1990's. *See McFarland v. Brier*, 769 A.2d 605, 612 (S.Ct. R.I. 2001) (finding evidence of "egregious misconduct deserving of punitive damages by Brier"). In *McFarland*, the court stated "we are satisfied that if ever egregious misconduct deserving of punitive damages has occurred, this is such a case. Indeed, the conduct in this case cries out for punishment." The court concluded that Brier "used a client's confidential information obtained within the context of a fiduciary relationship, to profit himself and at the same time harm his client." It stated:

> The trial justice found that Brier had disclosed trade secrets []. Knowing that what he was doing was wrong, Brier also lied to potential employees by urging them to lie about Bibeau's presence at meetings in direction violation of Bibeau's noncompetition agreement []. Brier's actions were by definition willful and malicious such that a failure to award punitive damages under the facts would amount to an abuse of discretion.

*Id. See also In re Brier*, 274 B.R. 37, 44 (D. Mass. 2002) (finding collateral estopped barred Brier's claims based upon the findings of Rhode Island Superior Court, and opinion of Rhode Island Supreme Court that his conduct was "willful and malicious" and "egregious misconduct" justifying punitive damages).

### D. Brier's Prior Financial Fraud Felony Convictions

Brier's documented history of fraud continued in 1998-2000, when he embezzled over $58,000 from his employer, and $97,646 from a client for whom he was the tax accountant and financial advisor. He received a 6-year suspended sentence and 2 years of home confinement for these crimes. PSR ¶¶ 73-74.

4

In December 2009, the United States brought a civil complaint for Preliminary and Permanent Injunction against Brier and his company "Refunds Now." In that complaint, the United States alleged that Brier and others improperly obtained and used filing identification numbers and filed returns which willfully understated tax liabilities and overstated deductions. At the time, Brier owned and operated companies which operated eight offices in Rhode Island and Southeastern Massachusetts and had prepared approximately 24,000 federal income tax returns from 2003 through 2007. The Internal Revenue Service (IRS) found that approximately 92% of the returns reviewed were not accurate or required some type of adjustment. 2010 WL 4510945 at *3. PSR ¶ 75.

On November 5, 2010, the Federal District Court for the District of Rhode Island issued an order preliminarily enjoining Brier and others from acting as federal tax preparers or filing or preparing returns for others. *Id*.

On March 7, 2011, the Court entered a permanent injunction enjoining this conduct. *Id. See also* 2010 WL 4510945. In entering that order, the Court found, Brier's testimony in that matter was "not the least bit credible." *Id.* 2010 WL at 4510945 at *11. The Court also found "persuasive evidence of Brier's repeated illegal, deceptive and fraudulent conduct." *Id.*

Nonetheless, in April 2011, IRS agents found tax returns prepared by Brier after the date of the permanent injunction and documents demonstrating that he continued to provide tax preparation services thereafter. PSR ¶ 75. In addition to continuing to provide tax services after the dates of the preliminary and permanent injunctions, Brier falsely submitted an April 2011 Affidavit of Complaint to the Court claiming that all of his customers had been notified of the injunction when in fact fewer than half of them had been notified. *Id.* Brier also pleaded guilty to filing false tax returns for himself from 2004 through 2009. In each, he falsely verified in

writing that the returns were true. *Id.*

In sentencing Brier in 2013, the Court noted the following:

> In each instance, these were crimes of choice. …Mr. Brier is an extremely intelligent human being. He has the degrees to prove it.
>
> He, therefore, had the capability of making a very good living honestly, but he chose to break the law. And in the course of doing so … he hurt his own clients by doctoring up their tax returns and then subjecting them to audit. …
>
> Frankly, I'm not surprised that he violated that order. His whole approach to how he handled his business and how he handled the investigation by the IRS was one of utter contempt on his part, and so it's somewhat ironic that he is here before the Court today having admitted to his own contempt of the Court's order.
>
> That behavior is then exacerbated by the fact that he saw fit to cheat on his own tax returns; and again, this behavior that was not motivated by need. Mr. Brier had the ability to earn a very decent living, but he chose to cheat. And so that behavior was motivated by his own greed.

Att. A at 10-11.

In the judgment in that case, the Court also entered an order of restitution of $399,424. PSR ¶ 75. Despite his significant earnings since then, Brier has made payments of only $15,380 in the intervening ten years and still owes $384,044 in restitution.

D. The Health Care Fraud Case

On April 11, 2024, Brier pleaded guilty to a one count Information for engaging in a health care fraud conspiracy, in violation of 18 U.S.C. § 1349.

As set forth in the PSR and stipulated to by Brier in the agreed-upon statement of facts, Brier began his scheme to defraud health care benefit programs at least as early as February 2018 by fraudulently obtaining a Medicare billing number using the identity of another to conceal his own criminal past – including a federal tax fraud conviction for which he was still on supervised release. PSR ¶¶ 11, 14-23.

Brier concealed in his initial application and throughout the scheme that he was always

6

the de facto owner and Chief Operating Officer of Recovery Connection Centers of America ("RCCA"), a healthcare company meant to provide treatment for opioid addiction. Brier was the director and manager of all RCCA's operations and was in control of RCCA's financial accounts. PSR ¶¶ 11, 18.

From the beginning of its operations until his arrest, Brier caused RCCA to consistently submit false and fraudulent claims for psychotherapy and counseling services that did not occur for the length of time billed to be submitted to Medicare, Medicaid, and other insurers. Brier caused false and fraudulent claims for counseling sessions in amounts that totaled more hours of service in one day than it is possible for the facility to have completed in a 24-hour period, while the facility was only actually providing services for 4-6 hours a day.  PSR ¶¶ 28-46.

Brier caused RCCA to consistently bill for 45 minutes or more for every therapy session, while also demanding that counselors see patients for no more than 5-10 minutes. He caused RCCA to book patients at a rate that would not allow counselors to see patients for more than a few minutes, depriving a vulnerable population from receiving meaningful counseling. He also engaged in numerous fraudulent behaviors to maintain this scheme, including falsifying records, encouraging the falsification of records by RCCA staff, and even purporting to be a medical provider and signed prescriptions. PSR ¶¶ 44-48.

From April 2018 until his arrest, Brier used his fraudulent company to bill for more than $15 million in health care claims, for which received more than $2.4 million in payments for claims submitted to Medicare, more than $7.2 million in payments for claims submitted to MassHealth and over $6 million for claims submitted to other health care payors. PSR ¶ 24.

7

## GUIDELINES CALCULATION

The government submits that the defendant's total "offense level" under the Guidelines include is level 29. This is calculated as follows:

| | | |
|---|---|---|
| Base offense level | 6 | § 2B1.1(a) |
| Losses from the offenses more than $3,500,000 but not more than $9,500,000 | +18 | § 2B1.1(b)(1)(G) |
| Federal Health Care Fraud Offense | +2 | § 2B1.1(b)(7)(A), (B)(b)(1) |
| Use of sophisticated means | +2 | § 2B1.1(b)(10)(C) |
| Organizer/leader | +2 | § 3B1.1(c) |
| Obstruction | +2 | § 3C1.1 |
| Acceptance of responsibility | -3 | § 3E1.1 |
| **Total offense level:** | **29** | |

Defendant has agreed to all aspects of this calculation except the enhancement for sophisticated means.

A. <u>Sophisticated Means Enhancement Is Warranted for this Elaborate Scheme</u>.

The government submits that Probation correctly included the sophisticated means enhancement because the defendant intentionally engaged in or caused the conduct constituting sophisticated means, pursuant to USSG § 2B1.1(10)(C).

As reiterated by the First Circuit in *United States v. Jimenez*, 946 F.3d 8, 15 (1st Cir. 2019), "[s]ophisticated means are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1 cmt. n.9(B). The conduct must involve some greater level of concealment than a typical fraud of its kind. *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (requiring "a greater level of planning or

8

concealment than a typical fraud" (citation omitted)).

Brier argues that his conduct was not especially sophisticated for a health care fraud. However, his conduct involved exactly the kinds of especially sophisticated scheme and concealment that are the hallmarks of sophisticated means and go far beyond overbilling for health care services. By his own admission in the agreed-upon statement of facts, in addition submitting millions of dollars of fraudulent claims to Medicare, Medicaid and other insurers, Brier did the following:

> (a) created his company by using another doctor as the purported owner and director to conceal his own criminal record, PSR ¶¶ 11, 14, 23;
> (b) caused his staff to deprive their patients of even minimal time for the treatment they were seeking for addiction, PSR ¶¶ 34-40;
> (c) falsified prescriptions and purported to be a licensed prescriber; PSR ¶ 48;
> (d) engaged in various means to cover up his scheme, including directing his staff to alter records in response to audits, PSR ¶¶ 49, and by writing an extensive letter seeking to justify his fraudulent billing as supported by actual services. ¶¶ 46-47
> (e) caused a physician to sign documents that were false and/or back-dated to conceal the defendant's role in the business, PSR ¶¶ 49
> (f) instructed a potential witness not to report to federal investigators what was occurring at RCCA, PSR ¶ 50; and
> (g) used multiple corporate entities to carry out that fraud and move funds, including, as noted in the agreed-upon facts as to forfeiture, into accounts in the name of Rosemary Brier, Recovery Connections Centers of America, Barrington Urgent Care, PC, RC Management Services at Bank of America as well as in a real estate purchase in Panama. ¶¶ 51-54.

Brier also admitted that he conducted or attempted to conduct financial transactions, with proceeds that he knew were from the healthcare fraud, for the purpose of concealing the nature, source, location, ownership, or control of those proceeds and that funds from the fraud were used to purchase assets and transferred to other accounts, which constituted concealment or attempted concealment of his receipt of illegally obtained proceeds. PSR ¶ 52. He has further admitted that he used proceeds of the fraud to purchase properties in an attempt to conceal the illegally obtained proceeds. *Id.*

The First Circuit has repeatedly found similar and less sophisticated conduct to justify the enhancement. For example, in *Jiminez*, the First Circuit upheld the enhancement in a bank fraud case, where the scheme involved recruiting straw buyers, using aliases, and advising mortgagors on whether to continue making their mortgage payments, even though these acts were also part of the core of the fraud scheme of conviction. *Jimenez*, 946 F.3d 8, 15. *See generally United States v. Kitts*, 27 F.4th 777, 790 (1st Cir. 2022) (holding that unauthorized use of client signature and fake company justified sophisticated means enhancement to wire fraud and aggravated identity theft charges); United *States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (upholding application of the sophisticated means enhancement where the defendant "set up multiple corporate entities in order to facilitate his fraudulent schemes"); *United States v. Foley*, 783 F.3d 7, 26 (1st Cir. 2015) (upholding application of the enhancement where, inter alia, the defendant used fake checks and "directed his paralegal to draw and then redeposit a check ... to create the appearance that the borrower's funds had been received").

The record amply supports the application of the sophisticated means enhancement where the defendant used his employee's identity to submit false claims, set up a fraudulent entity to be able to bill Medicare despite his criminal record, and funneled and concealed the proceeds through various entities and accounts.

B. <u>Acceptance of Responsibility Adjustment</u>

With respect to the adjustment for acceptance of responsibility, the United States submits that this is one of those cases where both the enhancement for obstruction and the adjustment for acceptance of responsibility are appropriate. After the defendant's obstructive conduct in this case, and after the complaint was filed, but before any indictment, the defendant did accept responsibility for the crime charged and he and his counsel worked with the United States to

10

reach a resolution, including as to the many assets for forfeiture and agreeing to almost all of the Sentencing Guideline's calculations and an agreed-upon sentencing range. Thus, the United States submits that the defendant has demonstrated acceptance of responsibility for his crimes early in the proceedings in a manner that avoided further delays or and meaningfully advanced the interests of justice in this matter.

### Criminal History

The parties calculate Brier's criminal record places him in Category II. The total offense level of 29 in Category II yields a range of 97-121 months, which is subject to the ten-year statutory maximum. The government recommends a term of incarceration of ten years.

### III.  SENTENCING RECOMMENDATION

A sentence of ten years is fully merited and necessary here to appropriately punish this serial fraudster. The sentence is justified not only by the defendant's serious crimes in this case, but also because of his fraud, cheating, abuse of others – including his own clients and patients – and contempt for the law and this Court. Nothing other than incarceration can stop him.

A.  Nature, Circumstances, and Seriousness of the Offenses

The defendant conducted a sophisticated scheme to defraud the government and other health insurers, and the patients who came to his clinics, by charging for treatment services which he instructed his staff not to actually take the time to provide to this underserved and needy population. PSR ¶¶ 34-40. Brier now suggests that he got into this business to help these patients suffering from addiction, but his conduct demonstrates otherwise. *See* Defendant's Corrections/Clarifications and Objections to the PSR at 4-5. He repeatedly prevented his staff therapists from actually providing therapy to the patients, while at the same time billing that therapy at the higher levels as if they had provided 45 minutes or more of treatment for each

11

visit. As the undisputed facts demonstrate, in one location at least, the manager was ringing a bell to tell the therapist not to spend the time needed with their patients. PSR ¶ 39. One of the lead therapist and trainer of the others, co-defendant Mi Ok Bruining, bragged that she was the "drive-by queen" because her visits with the patients were so short to be a drive-by. PSR ¶ 40.

In reality, Brier was and remains a fraud who was using the funds that should be devoted to treatment to enrich himself and cheat the system trying to provide hope and opportunity to these patients. This is not a case where he started out in honest work and slipped. He lied from the very beginning of this operation – claiming that it was run by a doctor, when in fact Brier was totally in control the whole time. This started in February 2018, while he was still on supervised release from his prior crimes. It all occurred while he still owed (and owes) restitution for his prior tax frauds. But he took the profits nonetheless, not to pay his restitution debts, but to put them in other accounts in the name of others and live well – adding on to this ex-wife's house in Newton, MA and buying himself and her fancy cars and investing in a beachfront property in Panama. *See* PSR ¶ 51 (listing assets to be forfeited, including 2020 Mercedes Benz GLE350, a 2019 Lexus RX350, and interests in real estate in Playa Escondida Beachfront, Panama).

When insurers got suspicious and started asking questions, Brier once again doubled down on his fraud. He lied to the insurers and claimed in writing that his clinics were treating such complex patients and providing such extraordinary care that every session really did need to and did last at least the 45 minutes. PSR ¶ 46. He directed his staff to alter the records for the auditors to make it falsely appear that they had provided the 45 minutes of treatment. PSR ¶ 47. Something he had prepared for all along by having the staff not put a.m. or p.m. on their billing records so that the times could be manipulated to hide the fact that the appointments were all

12

overlapping. PSR ¶ 41.

Then, when Brier got wind that there were federal investigators asking questions, he bullied the physician whose name he had used for the fraudulent application to sign a document and back-date it purporting to give Brier full authority to use his name. PSR ¶ 49. He also told other employees not to talk to the investigators or tell them what was really happening at RCCA. PSR ¶ 50.

B. <u>History and Characteristics of the Defendant</u>

The defendant has had many opportunities in his life – which he has squandered. He had a supportive family and upbringing. But he was not content to earn money honestly.

As set forth above, he has engaged in an extensive history of fraudulent and criminal behavior for over a quarter of a century. In addition to various criminal convictions and cases prior to his conviction for tax evasion and criminal contempt, in 2011, he was ordered by this Court to stop preparing fraudulent tax returns. Ordered. In no uncertain terms. But he did not stop. He did not reform. He did not become a better man.

Instead, Michael Brier ignored that order. He continued preparing fraudulent tax returns and created entities and offices so that he could do so in the name of others. Then, as in this scheme, he built a whole business with multiple offices and employees, all of which he directed to preparing fraudulent submissions.

Moreover, his fraudulent tax scheme, like the current scheme, shows enormous ambition and use of his intelligence in creating a set of companies and training many employees to carry out the fraud at a massive scale. His intelligence and abilities are clear – but he has used them over and over to cheat and mistreat others, as well as steal the money of others.

At sentencing in that matter, in 2013, Brier apologized to the Court and to his family for

the pain, suffering and trouble his actions had caused. Att. A at 10. But it did not change his behavior. It has only escalated in scope and impact since then.

As noted above, at that sentencing, the Court clearly warned Brier that he would be incarcerated for much longer to stop him if he were to reoffend. *Id.*

Brier also carried on this fraudulent scheme even after being treated for myelofibrosis, a rare form of cancer, and receiving a successful bone marrow transplant in 2019. PSR ¶ 101. He was lucky enough to receive a bone marrow transplant from a donor and survive his cancer diagnosis. For many, that might have been a chance to turn their life around – go on a new path, help others, and do right. But not for Michael Brier – even with the good fortune of surviving cancer and receiving the support of his ex-wife and daughter – he pushed his fraudulent enterprise further and expanded the fraud to more locations. All the while, he was operating under a fraudulently obtained billing number and insisting that every appointment be booked for no more than 15 minutes but billed for 45 minutes.

Defendant stated in his letter to this Court (quoted in his objections to the PSR) that he "started RCCA to make a difference in the world" and even seek to rely upon the Jewish term for service to improve the world "Tikun Olam." Defendant's Corrections/Clarifications and Objections to the PSR at 4-5. The facts, however, demonstrate otherwise. From the very beginning, Brier used fraud and lies to start RCCA under the name of others. From the very beginning he billed for full therapy sessions while not even providing minimal time for his staff to provide therapy. Although he claims that he wanted "to serve people who were shunned by much of society" and identified with them as someone who had a history of substance abuse, again, *id.*, his actions speak far louder than his words. If he was really interested in helping RCCA clients get better and healthier, he would not have deprived them of the therapy that they

14

were seeking or berated his therapist who tried to do so.

To the contrary, this is a continuation of his life of deceit – pretending to care about others while actually cheating them and using them to serve his own greed. He did that when he abused his tax clients and it only got worse when he saw he could make money by cheating patients suffering from addiction of the treatment they needed.

C. The Need for Specific Deterrence

Brier has lied to the Court and violated court orders consistently over many years. There is simply no reason to believe that he engaged in this fraud for the good of anyone other than himself. No matter what he tells this Court, or even himself, he has lived a life of fraud and deceit and that is not going to change now.

A sentence including a significant term of incarceration is also important to deter this specific defendant and protect society from his relentless pursuit of fraud upon others. It is not drug abuse or violent crime alone that makes a criminal a danger to society, it is a lack of respect for the rules of society. *United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009). This defendant has repeatedly demonstrated that he is a danger to society. He has unlawfully enriched himself through his fraudulent schemes and brazenly capitalized off his maltreatment of vulnerable populations.

Previous sentences have clearly failed to sufficiently deter the defendant's criminal activity. He conducted part of the criminal activity at issue here while on supervised release from previous sentences. As noted above, Brier was warned at the time of his previous federal tax conviction that he would be incarcerated extensively if he were to reoffend. Att. A. at 12-13. He went ahead and launched this enormous fraudulent scheme nonetheless – before he was even off of supervised release.

15

This is a case where specific deterrence in the form of incarceration is plainly required. Nothing except incarceration appears to work to keep this defendant from committing significant frauds and victimizing others.

D. Need to Promote Respect for the Law and Just Punishment and General Deterrence

Such a punishment is also appropriate to promote respect for the law and just punishment. It is critical to the economic efficiency and continued survival of important government health insurance programs that benefits be provided only to those who qualify for them and that the services actually be provided. The cynicism of taking such extensive advantage of programs intended to aid those suffering from addiction is staggering.

Serious sentences in such cases of white-collar crimes of fraud upon government programs, as well as here, upon the clients and staff of RCA, are required to send an appropriate deterrent message and uphold respect for the law.

The fact that Brier not only set up the business by fraud, not only billed fraudulently – but literally deprived these patients of the treatments they were seeking and their therapist wanted to provide and felt they needed is a level of disregard for the suffering of others that exceeds even his prior crimes.

Fraudulent procurement of such benefits both erodes public trust in the programs and stresses the system's ability to efficiently deliver benefits to vulnerable people. It is important to make clear that such extensive attempts to abuse the programs and resources available to help those suffering from addiction turn their lives around will result in significant terms of incarceration. Such a message is critical to deter others who may see such programs as an easy target. It is also important that those who follow the law see that such a serial fraudster pays a heavy price for his crimes.

E.  <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct</u>

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished.  *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses.").  Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).  The recommended sentence is also consistent with the need to avoid unwarranted disparities in sentences.

(1) *United States v. Vincenzo* (C.D. CA 2024) (10+ years for $5 million health care fraud and aggravated identity theft by CEO of health clinic); https://www.justice.gov/usao-cdca/pr/former-ceo-whittier-health-clinic-sentenced-more-10-years-prison-running-multimillion;

(2) *United States v. Daniel Hurt,* (W.D.PA 2024) (10 years for $97 million health care fraud and kickbacks scheme), https://www.justice.gov/usao-wdpa/pr/florida-man-sentenced-10-years-prison-and-ordered-pay-more-97-million-restitution;

(3) *United States v. Kinrys* (D. MA 2024) (99 months for $19 million health care fraud by doctor for mental health treatments that were never provided); https://www.justice.gov/usao-ma/pr/wellesley-psychiatrist-sentenced-over-eight-years-prison-19-million-insurance-fraud;

17

(4) *United States v. Khaim* (E.D. NY 2024) (97 months for $18 million fraudulent billing to Medicare and money laundering by pharmacy owners), https://www.irs.gov/compliance/criminal-investigation/pharmacy-owners-sentenced-to-18m-covid-19-health-care-fraud-and-money-laundering-scheme ;

(5) *United States v. Kirk* (M.D. LA 2023) (82 months for $1.8 million health care fraud), https://www.justice.gov/usao-mdla/pr/former-louisiana-health-clinic-ceo-sentenced-82-months-federal-prison-medicaid-fraud;

(6) *United States v. Mitchell* (E.D. MI 2023) (84 months for $2 million health care fraud by owner of podiatry practice), https://www.justice.gov/opa/pr/podiatrist-sentenced-fraudulently-billing-medicare-nearly-2m-under-false-identity;

(7) *United States v. Cooper* (ND TX 2020) (20 years for $70 million health care fraud and kickbacks), https://www.justice.gov/usao-ndtx/pr/health-care-executive-sentenced-20-years-tricare-fraud-case;

(8) *United States v. Ligotti,* (S.D. FL 2023)(20 years $127 million fraudulent billion for medically unnecessary drug tests by sober homes medical director); https://www.justice.gov/opa/pr/florida-doctor-sentenced-substance-abuse-treatment-fraud-scheme;

(9) *United States v. Bomer* (S.D. TX 2019) (10 years for $16 million Medicare fraud scheme by hospital Chief Financial and Operating Officer), https://www.justice.gov/opa/pr/texas-hospital-administrator-sentenced-10-years-prison-role-16-million-health-care-fraud;

(10) *United States v. Burkhart* (S.D. IL l2018) (9.5 years for $19.5 million health care fraud and kickback scheme for CEO of nursing home chain), https://www.justice.gov/usao-sdin/pr/former-health-care-chief-executive-sentenced-95-years-federal-prison;

(11) *United States v. Chatman, K* (S.D. Fl 2017) (27 years for multi-million dollar health care fraud and money laundering scheme to owner of sober homes and addiction treatment centers), https://www.justice.gov/usao-sdfl/pr/owner-sentenced-more-27-years-prison-multi-million-dollar-health-care-fraud-and-money;

(12) *United States v. Oriakhi* (S.D. TX 2017) (40 years for $17 million health care fraud scheme for owner of home health agency), https://www.justice.gov/opa/pr/houston-home-health-agency-owner-sentenced-480-months-prison-conspiring-defraud-medicare-and.

Moreover, none of the cases cited above appear to involve defendants who had prior federal convictions, unlike Brier. Nor do they appear to involve defendants who have the long history of

18

fraud both civil and criminal as well as violation of court orders in which Brier engaged.  *Cf. United States v. Shams*, (CA 2024) (10 years for Medicare fraud, multiple prior convictions).

Here, Brier was able to begin his fraud only because he fraudulent created RCCA and claimed that he was not the one owning and running it.  His fraud was extensive – resulting in more than $15 million in billings by his fraudulent company.   Moreover, his fraud did not just involve overbilling – it involved the mistreatment and denial of treatment to patients in need – literally forcing them out of their treatment sessions so more patients could be funneled through and billed.

Brier deserves the ten years.  He has dedicated himself to a life of deceit and fraud and specific deterrence requires a long sentence.  Moreover, his repeated and extensive conduct and callous disregard for the care of the patients whom he claimed (and still claims) to be serving also deserves such a sentence.  It is comparable to and appropriately calibrated to the sentences of other owners and corporate executives carrying out multi-million-dollar health care frauds.

## **CONCLUSION**

The government asks that this Court sentence Brier to the kind of sentence that will, we hope, finally shut his down his fraud completely.  It is clear that he will not abide by Court orders.  His contempt for the law, for the rules of society, for the Court, for his own clients and patients, is clear and demonstrably irremediable.

There is simply no denying that the defendant is a very clever and experienced criminal mastermind who cannot be trusted – not to tell the truth, not to reform, and not to obey orders of this Court.  The ten-year sentence recommended by the government here is thus both necessary and deserved to appropriately to punish and deter such a sophisticated fraudster and to protect the public from further crimes by a defendant with such an extensive history of fraud.

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of 120 months of incarceration, three years of supervised release, restitution in the amount of $3,515,100, and forfeiture order of $3,515,100.

Respectfully submitted,

ZACHARY A. CUNHA
United States Attorney

By:  */s/ Sara Miron Bloom*
     SARA MIRON BLOOM
     KEVIN LOVE HUBBARD
     Assistant United States Attorneys
     U.S. Attorney's Office
     One Financial Plaza, 17th Floor
     Providence, RI
     401-709-5015
     Sara.bloom@usdoj.gov

Date:   January 3, 2025

## Certificate of Service

I hereby certify that on this 3rd day of January, 2025, I caused this document to be filed electronically and thus to be available for viewing and downloading from the ECF system.

By:  */s/ Sara Miron Bloom*
     SARA MIRON BLOOM
     Assistant United States Attorney